ARGUMENT FIRST NUMBER 2011-1536 ADVANCE CONSTRUCTION V. DEPARTMENT OF THE ARMY Good morning. May it please the Court, this is a case about a wrongful termination of a contract. As this Court has previously held in decisions, a default termination is a drastic sanction which should be imposed or sustained only for good grounds and on solid evidence. The basis for our appeal, we believe the Board, when we barred the Board, erred in recognizing that ADVANCE CONSTRUCTION's appeal to the Board of Contract Appeals failed to recognize that the Government's interpretation of certain contract obligations regarding excavation of fill materials was unreasonable and unnecessary. Here the Army, through the Corps of Engineers, incorrectly and unreasonably applied various parts of the contract against the contract. We've argued that this is very evident in the borrow area directional restrictions. The project at issue here is a levee improvement project in northeastern Louisiana. ADVANCE contracted with the Army to perform this over a fixed period of time. They were required to excavate certain materials and place them on the levee to increase the embankment. They were required to take those materials from designated borrow areas. Two of those designated borrow areas were on the land side of the levee. There's the river side and the land side. The Government obtained agreements from landowners to use this material. Those agreements were not part of the contract with ADVANCE. The Government did place restrictions on the borrow areas. It was known to the Government at the time that the amount of fill material in those borrow areas would be exhausted or used up. Still, the Government imposed directional restrictions on the contractor in terms of how it had to drain the borrow areas and how it had to excavate. In the contract? In the contract, yes. Those weren't post-contract restrictions imposed? No, Your Honor. Those were set out in the excavation requirements in general and specific to this particular borrow area. Another restriction that was placed was that borrow area 2B, which is the one at issue here, was the last one to be used. The material was going to be used, so this directional restriction that was imposed was, in effect, unnecessary because all of the material would have to be used to satisfy the placement requirements on the levee. Can I kind of switch gears just a little? I mean, the Board made findings that at the rate you were going during the cure period, there was no way you were going to complete this on time, right? And it's your job to then demonstrate that there's no substantial evidence to support those findings, and I'm having a hard time seeing how you can successfully do that. The Board did make findings about the levels of production we were achieving, and we contend and we've argued in our briefs that those productivity levels that the Board determined were erroneous because the Board was based, first of all, and the determinations that were made as to the production that was being achieved during the cure period was based on a number that was agreed to between the contractor and the government if a condition were satisfied, and that condition were to allow the contractor to open up the borrow area, to use scraper equipment to lay out the materials to allow it to dry sufficiently because there were also moisture restrictions in the contract. In other words, the soil... So you're saying the number the Board came up with is the realistic number, was not the correct number? We don't believe it was the correct number, and we did cite to that, and we did argue that in our brief that the productivity determination, first of all, the amount of material that the government, that the Board... Is that what the... I'm sorry, go ahead. Are we talking about the 10,000 cubic yards and those calculations? The 10,000 cubic yards per day number was the number that the Board and the contractor agreed to at the beginning of the cure period. And the Board found that during the cure period, the amount excavated was 6,407 cubic yards, was that right? Yes, that's around 6,000, that's... 3,000 and change under the 10,000. There's two issues there, Your Honor. First of all, there was a period of time during the cure period, roughly the first 15 days, where this restriction was not lifted in terms of allowing advanced construction to open up the bar area. And there was a ramping up period where advanced had to get additional equipment out there. And advanced agreed that it could meet the 10,000 yards a day if the government would allow advanced to open up the bar area. But didn't they lift that restriction? They did, Your Honor, after about 12 days into the cure period. And when they did, advanced's productivity level increased significantly. Didn't the Board account for that increase? And to simply take the number of cubic yards of material that you were moving and multiply that by the number of days that were left to come up with the number that fell short? But the Board looked at it... I'm sorry, I didn't mean to interrupt. The Board looked at it over the entire cure period instead of the period of time after the restriction had been lifted. And advanced contends that... I remember looking at this, and I can't remember the number, but how many days during the cure period did you excavate more than 10,000 cubic yards? I don't have the specific number of days. It's in the record, and I can... It's a pretty small number, if I recall correctly, is it not? It was less than half of the time, yes, Your Honor. And all of those days occurred after this restriction was lifted. It was a single day, wasn't it? Did we achieve the 10,000? Right. I believe it was more than one day. At most, I think, a small handful of days, if I recall correctly. I kind of thought it was one or maybe a couple also. It was not more than half. All right. Back to Judge Prost's question about the productivity. We believe that a proper calculation that should have been made by the Board would be to look at the total number of days remaining in the contract, including the allowable, excusable delays that the contracting officer did not give credit for. The Board gave credit for some of those days. At that level, we would have been achieving productivity at a much higher rate. Not at the 10,000 cubic yards per day, but at a rate sufficient to be able to complete the work within the allotted contract. Is that the number? You came up with the number of 9,200 and change. That's the number that advances expert Bill Canole testified to at the hearing, 9,236 per day. I couldn't find it. You cited to a page in the appendix with regard to that number, and I couldn't find the number on that page. Do you recall where it is in the record and what it is? If I may, just... Maybe it was just a miscite. Maybe I missed something, but I couldn't find where that... Your Honor, if I can submit a letter with this... Or you can maybe come back and rebuttal it. If I can find it then. Counsel, it seems to me that the Board made factual findings that the delay was caused to ACS's inadequate dewatering efforts. And you don't seem to argue against that. You seem to fall back on the argument that it was the government that was obliged to use different procedures. But yet there's a factual finding on the record that your client did not use proper dewatering procedures and that caused the delay. There were issues with dewatering. We contend that the controlling issue there had to do with being able to utilize all of the materials. And that drainage requirement would have been, in effect, irrelevant. Because by allowing ADVANCE to excavate the materials using the open cutting method as opposed to doing slot cutting or cutting trenches, would have allowed ADVANCE to dry the materials out sufficiently and overcome any of the drainage issues that arose. There were drainage issues. And I'm not going to stand here and say that ADVANCE did not have problems with draining this borrow area. But this allowing an opening up of the borrow pit when knowing, the government knowing that all of these materials would have had to be used, we contend that that's an unnecessary restriction that the government placed on ADVANCE's ability to perform the work in accordance with the means and the methods that it should have been permitted to use. And that by the board ratifying that, that constitutes error and it undermines the default termination decision. But your argument there, in as much as that requirement was in the contract, your argument really seems to be that the government should have may taken extra contractual steps to accommodate a contractor that was not under the terms of the contract able to perform, which is an unusual doctrine it seems to me. I can understand in certain circumstances it's going to be in the government's interest, maybe in many circumstances, to go ahead and waive particular contract requirements in order to ensure that the contract gets performed by the initial contractor. But I'm not sure where doctrinally we would find support for the proposition that the default termination is invalid if the government does not waive certain contractually agreed upon rights that it has and finds that under the contract as written the contractor can't perform. Your Honor, the best way I can respond to that is two points. First of all, I see it almost akin to a defective specification where this requirement is put in there and the government knows at the time that it's put in there that it's doing it to protect agreements that it has with landowners, but it knows it's most likely not going to be necessary and yet it still imposes that on the contractor. That's the first point. But you entered into that contract. Yes, we did enter into the contract. The second point is... It's not that the government has superior knowledge here. You're dealing with a contractor that I gather does this all the time. Advance has significant experience on this, but the government did have reports that were prepared and we cited to the Pyburn and Odom report that showed that the amount of materials in the borrow areas, 1, 2A and 2B, would all have to be used to satisfy the quantity requirements. The second point in response to your question or your comment is that the government did lift this restriction and when the restriction was lifted, the productivity increased significantly. Okay, we're into your rebuttal time. Would you like to save it? Yes, I would like to reserve the remainder of my time. Thank you. We'll hear from the Governor next, Mr. Smith. May it please the Court, Your Honor. The decision of the Armed Services Board of Contract Appeals should be affirmed because Advance has failed to establish any error of law in the Board's decision. It is not the duty, nor with all due respect, the prerogative of this Court to retry the facts of this case. I'd like to turn first, if I could, to the arguments raised by Advance concerning the allegedly extra-contractual requirements regarding the excavation requirements under Borrow Kit 2B. Those contractual requirements are spelled out in the contract. Notwithstanding Advance's characterization that these are extra-contractual, these are in fact expressly contractual. And they are found in the contract and they acknowledge that.  Because they tell a great deal about what the contract required Advance to do. There are several provisions. I'll just touch on one or two. With respect to 2B, it provided, among other things, that it would not be permitted to excavate in water. The area must be dried, must be dewatered from whatever source the water comes from. It specifically provided that 2B may not be excavated until 2A, another adjoining Borrow Kit, is completely excavated. And once 2B is excavated, commenced, it must do it in a particular manner. Essentially meaning, it's not really a square, but it's kind of squarish. And the contract requirements, 3.2, 2.1 required, start in the upper left-hand corner and go all the way down to the lower left-hand corner. And then move over, start at the top and move to the bottom. In rows. In rows. Starting on the west, finishing on the east. Now, is it the case, as your opposing counsel says, that everybody knew that all of the material from the borrow area would have to ultimately be taken? That is not correct, Your Honor. Okay. What's the support for the proposition? Or how do we... I give you that for this reason, Your Honor. The reason that the Borrow Bits are... It is a combination, I would characterize it, Your Honor, of science and art in terms of estimating how much dirt in the ground, compacted, is going to equal the elevation on the levee and down. The agency's typical practice is to try to oversize the areas of the Borrow Bits if they can for the pragmatic reason that it's really expensive to go back and buy more dirt later. Right. So, the requirements were 1 and 2A first, and then 2B if you need it. I understand that the contractors take the position that, well, we all knew that is the case. But, in fact, the agreements with the landowner, which drove the specifications here, indicated that the contractor in 2B would start on the left, which was lower lying, frankly, a pond, and move to the right. And the reason for that is because the land on the right was higher, and if it was not all needed, then that land to the right could be salvaged and could be kept by the landowner. How many landowners were affected? That I don't know, Your Honor. I believe this particular Borrow Bit, 2B, was one landowner. And I will say, Your Honor, although Advance argues for the proposition that they were completely unaware of these agreements, maybe they were, but that point is irrelevant because the government doesn't have an obligation to explain why its specifications are the way they are. But, in fact, we spelled out what the requirements were. Advance visited the site. The board judge found, in fact, that Advance saw a pond on the site when they visited the site pre-bid, and the contract clearly spells out the dewatering requirements. But, in any event, I'd like to draw the Court's attention to one document not mentioned directly in our brief, and that is at page 129, which is Advance's excavation plan, which was submitted under the contract. And you would see on 129, actually, I'm sorry, the document starts on 127, the cover page, 129, dewatering, paragraph 3, conservation of arable land. It starts off with this sentence, paragraph 4. To conserve arable land and to make optimal use of available borrowed material, Advance shall proceed in accordance with, and then identifies the specification. That's the same specification we're speaking of, and we don't need to read it, but the 1, 2a, b, and c's cover borrowed bit 1, borrowed bit 2a, and borrowed bit 2b. So my point is, in 2003, when they submitted their excavation plan, in their own words, they understood that the requirements of 2b were among other reasons to conserve arable land. In addition, Your Honor, in addition to the fact that the contract specifically required this, as the Board judge found as a matter of fact, the difficulties which Advance faced with respect to the moisture control, the moisture level in 2b was not as a result of the government's contract restrictions, but was a result of Advance's inadequate dewatering job in that particular site. The Board made specific findings of fact at 13, that a, the Advance failed to aggressively dewater in June of 2005. At the decision on page 20, the Board judge notes that the core contended that Advance did a subpar job with respect to dewatering, and the Board expressly found that we agree. And indeed at the bottom of page 20 of the Board's decision is a very lengthy paragraph expressly rejecting all three arguments which Advance made with respect to the government's restrictions on that dewatering pit. And finally, just so there is no doubt about it, I would refer the Court back to the 3.2.2.1 clause on excavation, and note that the contract on the front page of the contract, at page 47 of the appendix, the very front page, the government inserted a little warning on the very front page of the contract, and it says, the borrow areas excavated under this contract are required to be excavated considerably deeper than other projects in this area. See the specification. So they flag on the front page, this is going to be a harder job. And in fact, when you look at it, you find that not only do they say it's going to be considerably deeper in the specification, it says expressly in the specification, excavation to the required depth may require excavation below the groundwater table. That's on page 112 of the contract spec. And then it goes on to remind the contractor that they may not excavate in standing water. So the Board judge's finding that their problem with respect to 2B, was a factual finding, that their problem with respect to 2B was a result of their subpar watering efforts is entirely consistent with the fact that the contract spelled out in as plain a language as possible, that it was their obligation to dewater that, whatever the source of the water, wherever it came from. ACS presented two experts before the Board, and they gave an opinion that ACS deserves 42 days of extra time, but the Board rejected that outright. What weight should we give to experts testifying before the Board when there's two of them with the same opinion versus the decision of the Board? Well, the decision of the Board, Your Honor, was actually considered more than just the opinions of those two experts. Those were Mr. Canole and Mr. Heath. The Board also considered the opinion of the government expert, which was a gentleman named Mr. Strickler, and the Board also considered other record evidence, including daily job reports. Some of those were created by the contractors. They're called CQCs. Some of those were created by the government, QARs. And in finding fact number 32 and in finding fact number 33, the Board says expressly that he considered all of that evidence. And if we look to 33, we will see that what the Board says very pointedly is that in 32, he tells us, and I'll just read just a tiny bit, Your Honor. In 32, he says, The government offered Mr. Strickler, of course, paraphrasing, and Mr. Strickler compared the QCQ reports, the QAR reports, the job site weather data, and the reports of advances experts, Mr. Canole of Fravenel and Mr. Heath of Nicholson, and analyzed the Fravenel-NPCI added excusable delay days, and he cites the document, Respondents Exhibit No. 1 at Bases 16 and 24. So in paragraph 32, what the Board judge is saying is, I've listened to all these experts, and that Mr. Strickler also is doing a comparison or analysis of the 42 days asserted by the two experts for advance. In 33, here is what the Board judge concludes. Mr. Canoles and Mr. Heath opined that in addition to the 186 days of excusable delay that the CO granted advance, the contractor was entitled to 42 more days of excusable delay. And cite those days. And then here is what the Board concludes. Based on the degree that the CQCs, the QARs, and other record evidence substantiated those 42 days, and Mr. Strickler did not rebut them citing a document, that document is Mr. Strickler's report, we find that advance is entitled to 20 days of excusable delay.  So to answer your question, Your Honor, the Board heard the conflicting evidence of three different experts, looked at independent record evidence of the daily job reports, and concluded that the correct number of days is 20. Well, that's what concerns me. The experts testified as to 40 days of extra time, and what you just read, based on the degree that the CQCs, QARs, and other record evidence substantiated those 42 days, the government's expert did not rebut them, we find that ACS is entitled to 20 days. Yes, sir. My point is, that is quintessentially the job of a trier of fact, to hear the witnesses, whether they are expert or fact, to look at the records that exist, to take in expert reports, and determine what, in fact, is the fact that should be found. If the only rebutted evidence is 42 days... No, Your Honor. Mr. Strickler's report, the thing cited by the Board, which is Respondents Exhibit No. 1, at dates 18-23, which is in 33, that is Mr. Strickler's report. An excerpt of that report, unfortunately not the entire thing, but an excerpt of that report is included in your appendix, at appendix page 2077.1. I apologize that the specific six pages, which the Board is referring to, were not included in the excerpt which we provided, but we could provide it to the Court. I had the same question that Judge Reina has raised, and I wonder if this language that is used in paragraph 33 is perhaps a little confusing, because I was trying to sort through it, and is the Board saying, when the Board says, based on the degree that the other record substantiated those 42 days, and, and here's the critical language, and Mr. Strickler did not rebut them, is the Board saying Mr. Strickler didn't rebut any of the 42 days, or that based on the extent to which Mr. Strickler did not rebut, which is to say that he did not rebut with respect to 20, but he did rebut with the 22? That is exactly correct. So it's the latter, not the first. It's the latter interpretation. That's a somewhat confusing sentence. I stumbled over that. That is the explanation. And, again, I apologize. If I had given you the appendix pages from Mr. Strickler's report, which, as I say, I'll be happy to supply, you will see Mr. Strickler goes through day by day and says, I agree with this day, I don't agree with that day. I agree with this day, and I don't agree with that day. So the Board's finding is that to the extent he did not rebut them, I accept them, to the extent he did rebut them, I agree with Mr. Strickler. That's what he's saying, and my point here is that's quintessentially a finding fact. In the remaining time I have left, I'd like to address two last very quick points. Number one is the notion that the government took 11 or 12 days to respond to this request to open up Borough Pit 2B. I believe the record does not support that, and I would refer the Court to the Joint Appendix, first page 155, which is the contractor's letter asking for the thing to be opened of August 8th, which is where the date of August 8th comes from. However, if the Court were to look at 156, which is the government's response. I'm sorry, I'll say it's 156. It's 154, which is the government's response. Did I start good? I stand corrected. 159 is the government's response, and here's why the page is important. The government's response says, I refer to your letter dated August 8th, 2005, which is the request for the deviation, received by facsimile on August 15th at the Vidalia Engineering Office, wherein you request a deviation, et cetera. Slow-moving electrons. What's that, Your Honor? Slow-moving electrons. Slow-moving electrons, backdated letter. We got busy. Somebody didn't send it until they got it, but in fact the government received the letter on Monday, the 15th, and responded within four days, by Friday the 18th. And finally, Your Honor, I'd like to turn very quickly in the minute that remains to the findings of fact which the Board did make with respect to the progress or lack thereof which advance incurred on this project. The Board specifically found the amount of work to be completed was slightly more than 50 percent. In fact, it's 55 percent. The Board found that they're entitled to 114 days of additional contract performance. You can find that at finding fact 33, which amounts to 25 percent of the contact time remaining, yet 55 percent of the work remained to be completed on this work. The Board specifically found as fact, at finding fact 28 and 18, that 6,400 was the appropriate measure of the contractor's performance, and notwithstanding the fact that the parties used the 10,000 cubic yard per day figure during the cure period, the Board in fact correctly calculated that the correct measure of amount of material to be moved by the time of contract completion was in fact 11,000 yards, and you can find that at finding fact 33. So where a contractor has a requirement to move 11,000 yards a day averages only 6,400 yards a day, or where a contractor has consumed 75 percent of the available contract time but has performed only 45 percent of the work, it is entirely reasonable to conclude that they will not complete all of the work within the time remaining, which is the test from this Court under Elizabeth McDonnell-Lewis, and therefore, the decision of the Armed Services Board should be affirmed. Thank you, Mr. Smith. Mr. Walters, rebuttal. Thank you, Your Honor. First of all, in response to Judge Prost's question about the record, on page A308 is a copy of the Franville Corporation Summary prepared by Mr. Canole and submitted into the record, and in that, about the sixth column from the bottom is the 9236.31. I do submit that that print is pretty small, but that is what we were referring to in our brief. Second point I want to make, the government's attorney referenced a letter that Advance sent regarding the deviation request received by FACS dated August 15th. He made a comment that that was a backdated letter. There is no evidence in the record that that letter was backdated by Advance and submitted later, that it was dated August 8th and then submitted intentionally by Advance later. Well, but we have two dates. The latter is the date that the government, at least, asserts in its response to the letter was the date that it received the letter by FACS. But the fact is, that is in the record, is that the deviation request was granted and at that time Advance began opening up the borrowery and its productivity rates increased. And Mr. Canole's testimony is that at that point, from that point until the contract was terminated by the contracting officer, Advance was achieving an average daily production rate of 9,236 cubic yards per day. The calculation that we submitted in the brief would be, had the board correctly determined that the 42 days should have been added to the 86 days remaining in the contract, that would have carried it into the 2006 construction season, Advance would have needed to achieve a production rate of 8,848 cubic yards per day to complete the work within that remaining time, well less than the production rate that Advance was achieving when it was terminated. We believe that the board erred in its calculations in making that determination. Again, the record's clear that the board, that the, excuse me, there was, everybody knew Advance was going to use all of that material to meet the compaction requirements and the government really had no reasonable basis to keep that restriction imposed and it ultimately agreed with Advance and lifted that restriction and allowed Advance to open up the borrowery and when it did that, Advance's productivity levels increased. That's clear from the evidence that's in the record and there was no consideration given by the board to that factor. I think there was a finding that yes, productivity increased, but not to the level that would allow completion of the project on time. And one of the factors for that, Judge Raina, is that the board also included in its calculation about 100,000 cubic yards of uncompacted material, just basically loose dirt that had to be placed. That is not a controlling feature of work and the record is clear. The government's witnesses have testified at the hearing, the Advance's witness testified that the controlling feature of work on this project was placement of semi-compacted materials because of the moisture requirements. The material had to dry out so that it could achieve proper compaction. And the board included in that roughly 100,000 yards, which would have had a 10% factor, roughly 10% would have increased. There's a saying that the man who gets up late in the morning finds himself at night still running. Isn't this whole case that your ACS was underperforming substantially at the beginning of the period and then tried and was doing well during the cure period, but it just was never going to catch up? I'm not going to stand here and say that Advance's performance during the first two years of the project was stellar and proper. There were reasons for those delays. In 2004 construction season, if the board looks at the record, there were significant delays during that period of time between June and December when the days were counting, if you will. And high river stages, unusually severe weather, those had an impact on productivity. Advance raised those issues with the Corps, but they weren't resolved. So there's blame to go around there, and Advance accepts responsibility for some of those. But when the time came to really meet its requirements in the 2005 season, and when the restrictions, the unnecessary restrictions were lifted, Advance, we believe the record shows that Advance was meeting those production levels and could have achieved that, and the board gave no consideration to that. We believe there's authority for the proposition that the board should have given consideration for that, and there was error for it not to. Based on that, we would ask that the court reverse the Board of Contract Appeals' decision and remand with instructions to convert the termination for default into a termination for convenience. Very well, Mr. Walters. Thank you. Thank you. Mr. Smith, thank you. Case is submitted.